UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| AMERICAN OVERSIGHT *et al.*,<br><br>   *Plaintiffs*,<br><br>  v.<br><br>U.S. DEPARTMENT OF VETERANS<br>AFFAIRS *et al.*,<br><br>   *Defendants*. | Civil Action No. 19-2519 (RDM) |

## **MEMORANDUM OPINION AND ORDER**

The Federal Records Act ("FRA") prohibits agency personnel from using private email accounts for official business without taking certain remedial measures. 44 U.S.C. § 2911. Upon learning of a violation of the FRA, an agency head must initiate an enforcement action through the Attorney General to recover the records. *Id*. § 3106(a). If the agency head fails to do so, the Archivist of the United States ("Archivist") must step in to initiate the enforcement action through the Attorney General. *Id*. § 3106(b). The D.C. Circuit has held that, although these duties are mandatory, an agency may first attempt to retrieve the missing records on its own before calling on the Attorney General.

While serving as Secretary of the United States Department of Veterans Affairs (the "VA"), David Shulkin used a private email account for official agency business, including corresponding with "Mar-a-Lago associates" of President Trump about agency policy, in violation of the FRA. After reading about former Secretary Shulkin's unlawful email use in the newspaper, the VA began informal efforts to retrieve the federal records from his private

1

accounts.  Unsatisfied with the pace and results of that intra-agency process, Plaintiffs American Oversight and Democracy Forward Foundation, nonprofits that advocate for government transparency, filed this suit against the VA, current Secretary of Veterans Affairs Robert Wilkie, the National Archives and Records Administration ("NARA"), and Archivist David Ferriero (collectively, "Defendants") seeking to compel them to initiate an enforcement proceeding through the Attorney General.  Defendants move to dismiss on the ground that their ongoing efforts to acquire the records make Plaintiffs' claims unripe for judicial determination.

For the reasons explained below, the Court will **DENY** Defendants' motion to dismiss without prejudice and will defer consideration of the jurisdictional question presented in the motion until later in the litigation, once the parties have had an opportunity to develop a more complete record.

## I.  BACKGROUND

**A.    Statutory Background**

The FRA governs the "creation, management and disposal of federal records." *Armstrong v. Bush*, 924 F.2d 282, 284 (D.C. Cir. 1991).  Through the FRA, Congress sought to ensure the "[a]ccurate and complete documentation of the policies and transactions of the Federal Government" and the "[j]udicious preservation and disposal of records."  44 U.S.C. § 2902.  To those ends, the FRA requires the heads of federal agencies, including the VA, to "make and preserve records containing adequate and proper documentation of the organization, functions, policies, decisions, procedures, and essential transactions of the agency and designed to furnish the information necessary to protect the legal and financial rights of the Government and of persons directly affected by the agency's activities."  *Id*. § 3101.  Agency heads must establish and implement "effective controls over the creation and over the maintenance and use

of records in the conduct of current business," *id*. § 3102(1), and "shall establish safeguards against the removal or loss of records the head of such agency determines to be necessary and required by regulations of the Archivist," *id*. § 3105.  The Archivist, in turn, "shall provide guidance and assistance to [f]ederal agencies" on their records policies, *id*. § 2904(a); shall "promulgate standards, procedures, and guidelines with respect to records management," *id*. § 2904(c)(1); and shall "conduct inspections or surveys of the records and records management programs and practices within and between [f]ederal agencies," *id*. § 2904(c)(7).

As relevant here, agency officers and employees "may not create or send a record using a non-official electronic messaging account" unless the officer or employee either "(1) copies an official electronic messaging account of the officer or employee in the original creation or transmission of the record" or "(2) forwards a complete copy of the record to an official electronic messaging account of the officer or employee not later than 20 days after the original creation or transmission of the record."  *Id*. § 2911.

To prevent the unlawful destruction or removal of records, the FRA creates a "system of administrative enforcement."  *Armstrong*, 924 F.2d at 294.  If an agency head becomes aware of "any actual, impending, or threatened unlawful removal, defacing, alteration, corruption, deletion, erasure, or other destruction of records in the custody of the agency," the agency head "shall notify the Archivist" and "with the assistance of the Archivist shall initiate action through the Attorney General for the recovery" of those records.  44 U.S.C. § 3106(a).  If the agency head "does not initiate an action for such recovery or other redress within a reasonable period of time after being notified of any such unlawful action . . . or is participating in, or believed to be participating in any such unlawful action, the Archivist shall request the Attorney General to initiate such an action, and shall notify the Congress when such a request has been made."

*Id*. § 3106(b).  If both the agency head and the Archivist refuse to seek the initiation of an enforcement proceeding, then private litigants may sue under the Administrative Procedure Act to require them to do so.  *Armstrong*, 924 F.2d at 295.

### B.     Factual and Procedural Background

This case concerns former Secretary of Veterans Affairs David Shulkin's use of a private email account to conduct official VA business, including communications about VA policy with President Trump's private associates from his Mar-a-Lago Club.  Dkt. 1 at 2 (Compl. ¶¶ 2–3).

Plaintiffs submitted Freedom of Information Act ("FOIA") requests to the VA seeking former Secretary Shulkin's emails.  On May 4, 2018, and August 23, 2018, Plaintiff American Oversight requested "records regarding the influence of the Mar-a-Lago associates on VA policies and operations and records reflecting communications between agency officials and those private associates of the president."  Dkt. 1 at 5 (Compl. ¶ 11).  On July 2, 2019, American Oversight submitted an additional FOIA request seeking "all emails sent or received by former Secretary Shulkin on any personal email account regarding agency business."  *Id*.  On September 3, 2018, Plaintiff Democracy Forward submitted a FOIA request to the VA seeking "communications between VA officials, including former Secretary Shulkin, and the Mar-a-Lago associates and other records with the potential to shed light on the influence of those associates of the president on VA policies and operations."  *Id*. at 6 (Compl. ¶ 13).  On July 11, 2019, Democracy Forward submitted a further FOIA request to the VA "seeking all emails sent or received by former Secretary Shulkin on any personal, non-governmental, or nonofficial email account regarding official agency business."  *Id*.

In response to those requests, the VA released records indicating that senior agency officials, including Shulkin, communicated about VA policies and operations with "three of

President Trump's Mar-a-Lago Club associates: Marc Sherman, Bruce Moskowitz, and Isaac 'Ike' Perlmutter." *Id*. at 10–11 (Compl. ¶ 32–33) (citing *Mar-a-Lago FOIA Records*, Democracy Forward Found. (last visited Oct. 29, 2020), available at https://democracyforward.org/mar-a-lago-foia-records/; *VA Records Regarding Concerned Veterans of America*, American Oversight (Oct. 15, 2019), available at https://www.americanoversight.org/document/va-records-regarding-concerned-veterans-of-america). Those records also revealed that former Secretary Shulkin had corresponded with the President's Mar-a-Lago associates about official government business using a private email account, without either copying his official account on the messages or forwarding the conversations to his official account, in violation of the FRA. Dkt. 1 at 11 (Compl. ¶ 34). Media reports cited in Plaintiffs' complaint suggest that Shulkin created these private email accounts for the specific purpose of communicating with the President's associates from the Mar-a-Lago Club. *Id*. (Compl. ¶ 35) (citing Ben Kesling, *House Democrats to Probe How Trump's Associates Influenced the VA*, Wall St. J. (Feb. 8, 2019, 9:02 AM), available at https://www.wsj.com/articles/house-democrats-to-probe-howtrumps-associates-influenced-the-va-11549634520).

Emails from former Secretary Shulkin's private accounts made their way into the VA's initial productions to Plaintiffs only in the relatively rare situations in which Shulkin happened to forward those emails to a subordinate's official account. Dkt. 1 at 12 (Compl. ¶ 37). Plaintiffs allege that the "VA's preservation and production only of incidentally forwarded email communications demonstrates that private email communications concerning agency business that Secretary Shulkin did not incidentally forward to a VA subordinate's official account have been unlawfully removed from VA custody." *Id*. at 12–13 (Compl. ¶ 39). Because Secretary Shulkin failed to transfer all agency records located in his private email accounts to his own

5

official email account, he unlawfully removed those records from VA custody, in violation of the FRA. *Id*. at 13 (¶ 40).

On April 23, 2019, Plaintiff Democracy Forward sent a letter to Secretary Wilkie and the VA, copying Archivist Ferriero, to request that Secretary Wilkie act under the FRA to recover the records that former Secretary Shulkin removed, including by initiating an enforcement action through the Attorney General. *Id*. at 13 (Compl. ¶ 41); *see also id*. at 30–33 (Ex. C). To the extent that Secretary Wilkie failed to take such action, the letter requested that the Archivist initiate an enforcement action by the Attorney General to recover those records. *Id*. at 13 (Compl. ¶ 41). On May 14, 2019, Plaintiff American Oversight sent a similar letter seeking action from Secretary Wilkie and/or the Archivist to recover the missing records. *Id*. at 13–14 (Compl. ¶ 42); *see also id*. at 35–42 (Ex. D). Neither Plaintiff received a response to its letter, *id*. at 13–14 (Compl. ¶¶ 41–42), and neither the VA nor the Archivist has initiated an enforcement action through the Attorney General to recover the records, *id*. at 15 (Compl. ¶¶ 45–46). In separate FOIA litigation, moreover, Secretary Wilkie acknowledged that the agency had not yet recovered all the federal records located in former Secretary Shulkin's private email account. *Id*. at 14–15 (Compl. ¶ 44) (citing *American Oversight v. U.S. Dep't of Veterans Affairs*, No. 18-cv-2463 (D.D.C. June 27, 2019) (Dkt. 14 at 3)).

On August 21, 2019, Plaintiffs filed this lawsuit seeking to compel Defendants to initiate an enforcement action through the Attorney General as required by the FRA, alleging that their failure to do so has hindered Plaintiffs' ability to acquire the records they sought in their FOIA requests. Dkt. 1. Several factual and procedural developments have followed the filing of the complaint.

On October 28, 2019, Defendants filed a motion to dismiss, arguing that the case was not ripe in light of the VA's "ongoing—and to date, successful—efforts" to retrieve the missing records on its own, without resorting to the Attorney General's assistance.  Dkt. 7 at 5.  Defendants attached to their motion a declaration from John Buck, Director of the Office of Privacy Information and Identity Protection within the VA Office of Information Technology, detailing the agency's progress in recovering the records from Shulkin's private email accounts.  Dkt. 7-1 (Buck Decl.).  The declaration explains that Buck learned, as a result of press coverage, about Shulkin's use of his private email address for official business in February 2019.  *Id*. at 2 (Buck Decl. ¶ 4).  After an internal review, the VA sent a letter to Shulkin asking that he provide:

> (1) A list of all non-official email addresses Dr. Shulkin may have used to conduct VA business;
>
> (2) copies of all messages, including attachments, Dr. Shulkin sent or received during [his] tenure as the VA Secretary, using a non-official email account to conduct VA business; and
>
> (3) copies of any other official records Dr. Shulkin may have in his possession and written confirmation that (a) all such records have been provided to the VA, (b) Dr. Shulkin has retained no copies of such records, and (c) Dr. Shulkin does not have awareness of any such messages not provided to the VA.

Dkt. 7 at 7 (citing Dkt. 7-1 at 2 (Buck Decl. ¶ 5)) (internal quotation marks and brackets omitted); *see also* Dkt. 7-1 at 6–7 (Ex. A).

On June 21, 2019, Shulkin, through counsel, responded to the VA's letter.  Dkt. 7-2 at 2–3 (Buck Decl. ¶ 6).  He sent the VA approximately 21,985 pages of documents, *id*., which he identified in an attached cover letter as "records [he] created or received during [his] tenure at the VA and that [he] believe[d] fall under the Federal Records Act," *id*. at 9 (Ex. B).  Shulkin wrote that he "took reasonable steps," including consulting counsel, "to determine which messages on non-official email accounts are [f]ederal records."  *Id*.  But he included the caveat that he is "not an attorney, let alone an expert on the Federal Records Act," and he reserved the right to

7

supplement his response if he found additional records. *Id*. As of the date of the Buck Declaration, October 24, 2019, the VA was reviewing the documents Shulkin provided and identifying federal records contained therein. *Id*. at 3 (Buck Decl. ¶ 7). Pending the completion of that review, the agency had made "no final decision" as to "whether any further actions are necessary or appropriate to ensure that all potential [f]ederal records from Dr. Shulkin's personal email" had been recovered. *Id*. (Buck Decl. ¶ 8). On October 18, 2019, the VA sent Shulkin's counsel a letter requesting that he "preserve all emails in the non-official email accounts he used to conduct VA business that were sent or received during the period he was VA Secretary." *Id*. at 3–4 (Buck Decl. ¶ 9).

On November 15, 2019, the Court held a status conference to address Defendants' motion to dismiss. Dkt. 9. At the hearing, the Court asked two questions left unanswered by Defendants' motion and the Buck Declaration. First, the Court asked whether former Secretary Shulkin had responded to the VA's letter asking that he preserve all of his emails while the agency conducted its review of the initial documents he had provided. Dkt. 9 at 3. Second, the Court asked what methods or criteria Shulkin had used to separate out the federal records in his private email accounts and how the agency would determine the completeness of the records he had provided. Dkt. 9 at 7.

Although counsel had few answers at the hearing, Defendants addressed these questions in a status report filed on December 13, 2019. Dkt. 10. First, Defendants explained that the VA received a letter from Shulkin on November 13, 2019, in which he committed to preserving all messages in his private email accounts from the period when he served as Secretary of Veterans Affairs (and, through counsel, he later committed to preserving emails from his tenure as Under Secretary of Veterans Affairs for Health as well). Dkt. 10 at 1–2. As for the search criteria that

Shulkin had used to identify federal records within his private email accounts, the status report stated that he had employed a "guiding principle that any email sent or received during his tenure as Under Secretary of Veterans Affairs for Health or his tenure as Secretary of Veterans Affairs that pertained to agency business constituted a federal record." Dkt. 10 at 2. Shulkin started by consolidating all messages from two private email accounts sent or received during his tenure at the VA. *Id*. He then used "broad search terms" to identify "the likely universe of federal records in his personal email." *Id*. Finally, he "reviewed the results"—the status report did not indicate what this review entailed—"and marked for production all emails that pertained to VA business." *Id*. This process led to the nearly 22,000 pages that he sent to the VA. *Id*. at 3. The status report further asserted that Defendants had "raised a number of follow-up questions about Dr. Shulkin's search methodology with his counsel" and that Shulkin's efforts, "although considerable, require some supplementation to identify and recover all federal records residing in his personal email accounts." *Id*. Defendants relayed that Shulkin had expressed a willingness to cooperate in identifying any remaining federal records in his private email accounts. *Id*.

On January 16, 2020, Plaintiffs filed their opposition to the motion to dismiss, Dkt. 12, and, on February 7, 2020, Defendants filed their reply, Dkt. 13, attaching another declaration from Buck with further factual developments, Dkt. 13-1 (2d Buck Decl.). On December 23, 2019, Shulkin provided "nearly 31,000 additional pages of documents to VA from his personal accounts, bringing his total production to nearly 53,000 pages." Dkt. 13 at 6 (citing Dkt. 13-1 at 2 (2d Buck Decl. ¶ 5)). As of the filing of Defendants' reply, the VA's review of these additional documents was ongoing, and the agency had yet to determine "what (if any) further actions are necessary to ensure that it has possession of all federal records from Dr. Shulkin." Dkt. 13 at 6.

9

## II.  LEGAL STANDARD

Federal courts are courts of limited subject-matter jurisdiction and "possess only that power authorized by the Constitution and statute." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  Given "the nature and limits of the judicial power of the United States," the Court must assess its jurisdiction "as a threshold matter" and may not decide the merits of a case without first addressing the issue of jurisdiction.  *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (quoting *Mansfield, C. & L.M.R. Co. v. Swain*, 111 U.S. 379, 382 (1884)).  The plaintiff bears the burden of establishing jurisdiction.  *Kokkonen*, 511 U.S. at 377.  It is axiomatic that "subject matter jurisdiction may not be waived" and that "no action of the parties can confer subject-matter jurisdiction upon a federal court." *NetworkIP, LLC v. FCC*, 548 F.3d 116, 120 (D.C. Cir. 2008) (internal quotation marks and citations omitted).

A motion to dismiss under Rule 12(b)(1) challenges the Court's jurisdiction to hear a claim and may raise a "facial" or a "factual" challenge to the Court's jurisdiction.  *See Hale v. United States*, No. 13-1390 (RDM), 2015 WL 7760161, at *3–4 (D.D.C. Dec. 2, 2015).  A facial challenge to the Court's jurisdiction contests the legal sufficiency of the jurisdictional allegations contained in the complaint.  *See Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).  For a facial challenge, the Court must accept the allegations of the complaint as true and must construe "the complaint in the light most favorable to the non-moving party." *Id*.; *see I.T. Consultants, Inc. v. Republic of Pakistan*, 351 F.3d 1184, 1188 (D.C. Cir. 2003).  In this sense, the Court must resolve the motion in a manner similar to a motion to dismiss under Rule 12(b)(6).  *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

Alternatively, a Rule 12(b)(1) motion may pose a "factual" challenge to the Court's jurisdiction. *Erby*, 424 F. Supp. 2d at 182–83. For factual challenges, the Court "'may not deny the motion to dismiss merely by assuming the truth of the facts alleged by the plaintiff and disputed by the defendant,' but 'must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss.'" *Id*. (quoting *Phoenix Consulting Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)). In this context, the factual allegations of the complaint are not entitled to a presumption of validity, and the Court is required to resolve factual disputes between the parties. *Id*. at 183. The Court may consider the complaint, any undisputed facts, and "'the [C]ourt's resolution of disputed facts.'" *Id*. (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)).

A factual challenge to the jurisdictional allegations of a complaint, however, is subject to a significant limitation. As the D.C. Circuit has admonished, although a district court "may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard." *Herbert*, 974 F.2d at 198. This proviso to the usual rule ensures that, where jurisdictional defenses and the merits of a dispute overlap, the jurisdictional defense is not used—in the absence of special considerations—to short-circuit the factual development and adjudicative process to which a plaintiff is generally entitled.

### III.  DISCUSSION

In their motion to dismiss, Defendants concede many of the facts on which Plaintiffs' suit is premised. Dkt. 7. They acknowledge that former Secretary Shulkin used a private email account for official agency business in violation of the FRA, *id*. at 8, and they admit that the VA is obligated to recover those federal records, *id*. at 10–11. Defendants' motion to dismiss argues

11

only that the case is not yet ripe because of the VA's ongoing efforts to recover the records on its own. Dkt. 7 at 10–15. The motion thus presents the question of when an agency's failure to initiate an enforcement action through the Attorney General for the recovery of records, as required by the FRA, becomes ripe for judicial review. But because the facts necessary to resolve that question are "inextricably intertwined with the merits of the case," the Court will defer its jurisdictional decision until the merits are heard. *See Herbert*, 974 F.2d at 198.

The D.C. Circuit's FRA precedents establish two competing principles. First, although the FRA does not create an implied cause of action for private parties to seek recovery of records that were unlawfully removed from an agency*, see Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 148–150 (1980), plaintiffs can bring suit under the Administrative Procedure Act, ("APA"), 5 U.S.C. § 706(1), to challenge the "agency head's or Archivist's refusal to seek the initiation of an enforcement action by the Attorney General," *Armstrong*, 924 F.2d at 295; *see also Judicial Watch, Inc. v. Kerry*, 844 F.3d 952, 954 (D.C. Cir. 2016). The failure to bring an enforcement action is amenable to judicial review because of the FRA's "clear statutory language mandating that the agency head and Archivist seek redress for the unlawful removal or destruction of records." *Armstrong*, 924 F.2d at 296; *see* 44 U.S.C. § 3106. Thus, "[i]n contrast to a statute that merely *authorizes* an agency to take enforcement action as it deems necessary, the FRA *requires* the agency head and Archivist to take enforcement action." *Armstrong*, 924 F.2d at 295 (emphasis in original). And the FRA, with its use of "shall," leaves the agency head and Archivist "*no* discretion to determine which cases to pursue." *Id*. (emphasis in original).

But, at the same time, the court of appeals has noted that the FRA allows the agency to "first attempt[] its own remedial measures (rather than immediately rushing to the Attorney

General).*"* *Kerry*, 844 F.3d at 954. Indeed, "the FRA contemplates that the agency head and Archivist may proceed first by invoking the agency's 'safeguards against the removal or loss of records.'" *Armstrong*, 924 F.2d at 296 n.12 (quoting 44 U.S.C. § 3105). Such safeguards may include "intra-agency actions" like "disciplining the staff involved in the unlawful action, increasing oversight by higher agency officials, or threatening legal action." *Id*.

To harmonize these principles, decisions in this circuit have consistently held that if an agency's own remedial efforts succeed in recovering every reasonably acquirable record, then a lawsuit seeking to compel the agency to initiate an enforcement action through the Attorney General becomes moot. *See Cause of Action Inst. v. Pompeo*, 319 F. Supp. 3d 230, 236 (D.D.C. 2018); *Judicial Watch, Inc. v. Tillerson*, 293 F. Supp. 3d 33, 46–47 (D.D.C. 2017), *aff'd sub nom. Judicial Watch, Inc. v. Pompeo*, 744 F. App'x 3 (D.C. Cir. 2018). But the bar for establishing mootness in an FRA case is a high one. Even where the agency's efforts have borne "some fruit," an agency seeking dismissal of an APA/FRA action must "explain[] why shaking the tree harder—e.g., by following the statutory mandate to seek action by the Attorney General—might not bear more still." *Kerry*, 844 F.3d at 955. Thus, unless the agency can show "that the requested enforcement action could not shake loose a few more emails, the case is not moot." *Id*.

Here, the VA does not, and could not, argue that the case is moot—at least not yet. Although Shulkin has provided more than 50,000 pages of documents, the Court has no basis for determining how many total federal records his private email accounts contained. Those 50,000 pages might constitute all of the records that the agency needs to recover or only a fraction of them. Even at the time the VA filed its reply brief, the agency was still in the process of

determining "what (if any) further actions are necessary to ensure that it has possession of all federal records from Dr. Shulkin." Dkt. 13 at 6. In short, the case is not moot.

Rather than relying on mootness, Defendants invoke a different justiciability doctrine: ripeness. They argue that the pending lawsuit is not ripe for decision because the "VA has taken steps to secure the documents at issue in Plaintiffs' complaint without litigation[] and has not made a final decision about how to proceed pending further review of the materials received from Dr. Shulkin." Dkt. 7 at 11. Defendants assert that the "agency's continuing inquiry alone establishes Plaintiffs' claim is not ripe." *Id*. And waiting to see whether the agency will eventually recover all of the records in Shulkin's private email accounts could "prevent the need for court intervention and conserve judicial resources." *Id*. at 13. By invoking the ripeness doctrine, Defendants draw the two aspects of the D.C. Circuit's APA/FRA precedent back into tension, posing the question: at what point does the agency's leeway to recover the records on its own end and its obligation to ask the Attorney General for help begin?

In response, Plaintiffs argue, among other things, that this is a question for the merits, not a question that goes to the Court's jurisdiction, and that Defendants' motion, in effect, "seeks a ruling on the *merits* of Plaintiffs' claims of unreasonable delay under the guise of ripeness." Dkt. 12 at 16 (emphasis in original). Plaintiffs premise their claims on 5 U.S.C. § 706(1), which provides that a reviewing court shall "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). They argue that the ripeness doctrine "applies differently" to claims of unreasonable delay, because requiring an agency to finalize its administrative process before exercising judicial review over a claim whose very premise is that the administrative process is taking too long would be "definitionally illogical." Dkt. 12 at 18. Rather, in Plaintiffs' view, any dispute over the sufficiency of the agency's "reluctant and gentle remedial

14

actions," *id*. at 16, composed of "plodding engagement and 'kindly' requests for voluntary compliance," *id*. at 27, goes to the merits of whether the agency has unreasonably delayed initiating an enforcement action through the Attorney General, *id*. at 23–24.

The dividing line between questions of jurisdiction and questions for the merits is not always clear. But for the purposes of resolving the pending motion, the Court need not draw that line. Defendants' challenge to the Court's jurisdiction is a factual one, which depends on information outside the pleadings. *See Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018). As such, the Court must "give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction" and must give Plaintiffs "the benefit of all reasonable inferences." *Id*. (internal quotations marks and citations omitted). And, even more crucial here, if the "jurisdictional facts . . . are inextricably intertwined with the merits of the case," then the Court should "defer its jurisdictional decision until the merits are heard." *Herbert*, 974 F.2d at 198. Here, the ripeness inquiry and the merits are inextricably intertwined.

Defendants' motion to dismiss turns on what is known as "prudential" ripeness.[1] *See Garcia v. Acosta*, 393 F. Supp. 3d 93, 105 (D.D.C. 2019). To determine whether a case is

---

[1] Ripeness doctrine subsumes two inquiries—the Article III requirement that plaintiffs demonstrate an injury-in-fact as well as separate "'prudential reasons for refusing to exercise jurisdiction.'" *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (quoting *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807–08 (2003)). Although the case law on the topic is not entirely clear, courts in this circuit have treated the "prudential" aspect of ripeness doctrine as jurisdictional. *See, e.g.*, *Wyo. Outdoor Council v. U.S. Forest Serv.*, 165 F.3d 43, 48–49 (D.C. Cir. 1999); *Finca Santa Elena, Inc. v. U.S. Army Corps of Eng'rs*, 873 F. Supp. 2d 363, 370–71 (D.D.C. 2012) (granting Rule 12(b)(1) motion to dismiss based on lack of prudential ripeness). For present purposes, the Court need not decide whether an absence of prudential ripeness means that a case falls outside the Court's subject-matter jurisdiction or rather offers a basis on which a Court might decline to review a case that falls within its jurisdiction. *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 808 (distinguishing between Article III limitations on judicial power and prudential limitations on the exercise of that power); *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43, 57, n.18 (1993) (same).

prudentially ripe for judicial review, courts look to "the fitness of the issues for judicial decision" and "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).  Under the fitness prong of the test, the Court considers whether the issue is "purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Devia v. Nuclear Regul. Comm'n*, 492 F.3d 421, 424 (D.C. Cir. 2007) (internal quotation marks and citations omitted).

On the merits of a § 706(1) claim, the Supreme Court has explained that suits seeking to "compel agency action unlawfully withheld or unreasonably delayed" can proceed "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original).  As Plaintiffs note, courts have recognized the awkward fit between the ripeness doctrine, which generally requires courts to wait until the end of an agency process to undertake their review, and the merits of a § 706(1) claim, where the challenged action is a failure to act.  *See Fort Sill Apache Tribe v. Nat'l Indian Gaming Comm'n*, 103 F. Supp. 3d 113, 119 (D.D.C. 2015) ("For actions involving delay of an administrative action, the lack of a final order by the agency, which might otherwise engender a question about ripeness, does not preclude this court's jurisdiction.") (internal quotation marks and citations omitted); *see also Air Line Pilots Ass'n, Int'l v. CAB*, 750 F.2d 81, 85 (D.C. Cir. 1984) ("By definition, a claim of unreasonable delay cannot await final agency action before judicial review, since it is the very lack of agency action which gives rise to the complaint.").

But regardless of that tension, what matters here is that the ripeness inquiry substantially overlaps with the merits.  As explained above, the dispute in this case lies on a fault line in the D.C. Circuit's precedent, which holds both that an agency must request an enforcement action

from the Attorney General when records are removed or destroyed but also that the agency may try to solve the problem on its own first. *Compare Armstrong*, 924 F.3d at 295–96, *with id.* at 296 n.12. The question before the Court is at what point the agency's duty to bring in the Attorney General under the FRA, 44 U.S.C. § 3106, kicks in. That question can be framed as going to ripeness, but it can just as easily be framed as going to the merits of the § 706(1) claim: As a matter of ripeness, must a Court wait until an agency says that its internal efforts to retrieve the missing records are complete before exercising jurisdiction, no matter how long those efforts take or no matter how unsuccessful they may be? Or, on the merits, does an ongoing agency effort to retrieve the records, even if slow or ineffectual, prevent a court from finding that the agency has unreasonably delayed turning to the Attorney General for help? For present purposes, however, what matters is that the facts required to answer the ripeness inquiry are the same facts required to answer the merits questions. And for that reason, the Court will withhold judgment on the ripeness question until later in the litigation, once the parties have had an opportunity to develop the record with respect to both the Court's jurisdiction and the merits.

In their reply, Defendants invoke a pair of cases from this district to show that the ripeness and merits inquiries do not overlap and that the ripeness doctrine applies will full force to claims under § 706(1). Dkt. 13 at 13. Upon close inspection, however, neither precedent supports Defendants' position. One of the cases on which Defendants rely, *Hi-Tech Pharmacal Co. v. U.S. Food & Drug Admin.*, 587 F. Supp. 2d 1, 9 (D.D.C. 2008), simply does not stand for the proposition for which Defendants cite it, *see* Dkt. 13 at 13. In mistakenly asserting that the court in *Hi-Tech* denied a preliminary injunction motion because the plaintiff's § 706(1) claim was unripe, Defendants conflate two different holdings in the case. *Hi-Tech* rejected claims under § 706(2) of the APA, which provides for substantive review of final agency actions, on

17

ripeness grounds. *Hi-Tech*, 587 F. Supp. 2d at 10. But the court rejected the plaintiff's separate § 706(1) claim *on the merits*, holding that the plaintiff was not entitled to relief because the delayed action in question was "not a discrete agency action that the [agency] is required to take, pursuant to statute or regulation, by a time certain." *Id*. at 9.

The decision in *Mylan Pharm. Inc. v. U.S. Food & Drug Admin.*, 789 F. Supp. 2d 1, 13 (D.D.C. 2011), in contrast, does include some language favorable to Defendants' arguments—but that language is premised on the same misreading of *Hi-Tech*. *Mylan* observed that "final agency action—or its functional equivalent—is a prerequisite to judicial review, even for claims brought under § 706(1) of the APA for unreasonable delay." *Id*. The Court disagrees with that assertion, but only to the extent it is directed at § 706(1); the Court would agree if the statement were, as in *Hi-Tech*, directed at a claim brought under § 706(2) that substantively challenged "a failure to act" as though it were final agency action. *Hi-Tech*, 587 F. Supp. 2d at 8–10. The very next sentence of the *Mylan* decision, in any event, returns to the test for evaluating a § 706(1) claim on the *merits*: "[A] claim under Section 706(1) can proceed only where a plaintiff asserts that an agency failed to take a discrete agency action that it is required to take." *Mylan*, 789 F. Supp. 2d at 13 (internal quotation marks and citations omitted). Here, Plaintiffs sue under § 706(1), and thus they need not identify a "final agency action" or "its functional equivalent."[2] They must, however, demonstrate that the VA has failed to take a discrete agency action that it was required to take, and that merits question merges with the ripeness inquiry of whether the agency has done enough, promptly enough to comply with the statutory directive to "initiate

---

[2] Although not crystal clear, it appears that Plaintiffs also sue under § 706(2), Dkt. 1 at 17 (Compl. ¶ 58), and that they have failed to identify a final agency action sufficient to support such a claim. But because Defendants raised this issue for the first time in reply, Dkt. 13 at 12, the Court will not decide, on the current record, whether Plaintiffs have stated a claim under § 706(2).

action through the Attorney General" to obtain "recovery of records the head of the . . . agency knows or has reason to believe have been unlawfully removed." 44 U.S.C. § 3106(a)

Because the facts required to decide Defendants' ripeness challenge are the same facts relevant to the merits of Plaintiffs' claims, the Court will defer its ripeness determination.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Defendants' motion to dismiss. Defendants may renew their ripeness argument on summary judgment or, if they are able to retrieve all of the federal records from Shulkin's personal email, argue instead that the case is moot at that time.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge

Date: October 30, 2020